\* This case is also reported in *Bayard's Notebook, 8,* and *Wilson's Red Book,*

654

*Peery, Vining* and *Wilson* for plaintiff. *Read, Bayard* and *Miller* for defendant.

In the trial of this cause when it came again before the Court, the plaintiff produced as a witness Levin Thompson, a negro man. Upon an objection being made to his evidence, it was proved that he came from the State of Maryland, that he was born there of free parents, and ever since his residence in Delaware had been accounted a free man.

The defendant's counsel still contended that he was not a legal witness; and that he should be rejected upon principles of policy as well as law. First, the state of society in our country had established and our laws admitted the distinction which existed between white persons and Negroes, free persons and slaves. This distinction necessarily placed Negroes in a separate, inferior class, and although a casual instance such as the present may find a Negro who is a freeman, yet this is an exception from a general rule, and cannot operate against the general principles upon which the rule is founded. Individuals who are depressed into an inferior class or rank, below the common level of the society, will naturally have excited in their minds sensations of a jealous and invidious kind. They cannot love those who depress and enslave them, and who enjoy rights, privileges and advantages in the community of which they find themselves deprived. When these sentiments of hostility to the whites become generally circulated among the Negroes, they must be equally adopted by all those who are in the same association, whether freemen or slaves, and of course as free Negroes classed with slaves and not with whites, the objection is equally applicable to blacks of every description. Their sentiments growing up from infancy, their prejudices, their wishes must all be hostile to those parts of the community who look down on them with contempt. Further, it is well known that Negroes are generally uninformed as to the principles of morality and religion, which enter so essentially into the nature of a judicial oath, and without regard to which our persons, property or lives cannot be in a state of security.

Second, the principles and the spirit of the Act of Assembly passed February 3, 1787, apply to the exclusion of this witness. It is enacted, *vide* 3 Body Laws [800], s. 8, [2 Del.Laws 887,] that "no slave manumitted agreeable to the laws of this State or made free in consequence of this Act, or the issue of any such slave, shall be entitled to the privilege of voting at elections, or of being elected or appointed to any office of profit or trust, or to give evidence against any white person, or to enjoy any

other rights of a freeman, other than hold property, and to obtain redress in law and equity for any injury to his or her person or property." This Negro's being free from his birth in Maryland cannot take him out of the spirit of this Act. He must be the descendant or, as the Act says, the issue of some slave, at some time or other; and it would be absurd to grant privileges to blacks made free under the laws of Maryland, which are not enjoyed by those liberated under our own laws. The extent of the principles now advanced may sometimes produce cases of hardship and inconvenience and may deprive some persons of the exercise of rights of which they would make the most proper use; but the general good of the community and the law of the land must countervail particular instances of hardship and govern the decision of the court.

The plaintiff's counsel replied that in the decision of a question which went to deprive a citizen of such an invaluable right, nothing but the express law of the land, declared in the most positive, unequivocal terms, should be admitted as authority. That it must be a mistaken policy which would operate injustice and partiality, and both must certainly exist where a mere difference in color is to decide rights, and defeat the most interesting claims of a free man. The Act of Assembly can never be considered as extending to this case. It rather respects those who had been long kept in slavery, in the ignorance and debasement of slavery, and who had associated with slaves, adopted their customs, vices and principles, and of course entertained dangerous prejudices against the whites. The Act never should be extended beyond a literal construction, or so as to include cases not embraced by the expressions of it. Certainly that must be a highly penal statute which deprives persons of some of the dearest and most interesting privileges of citizens.

READ, C. J. The legal situation and the rights of Negroes in this State is an inquiry of great importance, and is entitled to the most deliberate consideration. It has received all the attention during the present argument which could possibly be devoted to it, and upon the fullest investigation of the question, the Court are of opinion that the witness cannot be admitted.

In the consideration of this question, we should not place out of view reasons of policy and public convenience. Though policy should not control law, it is frequently of service in the construction and proper explanation of it. Long before the passage of the Act of February 3, 1787, there were several laws of this state passed under the old government, which contemplated and seemed to admit the different classes in our society formed by

the whites and blacks, and the possession of superior privileges and rights by the former. Negro slaves are denied the right of trial by jury, and are directed to be tried by two justices and six freeholders. They are to be punished differently from whites for attempting to commit rapes, stealing, carrying arms, and meeting in companies, 1 Body Laws 71, 72, 73. There is an additional punishment on white women who have mulatto children, and also, on the negro or mulatto man, who is the father of such children, and on white men committing fornication with negro or mulatto women, 1 Body Laws 77. No Negro or mulatto can be employed to whip or inflict any corporal punishment on any white person, in any case whatever, [1 Body Laws 307]. By the Constitution of this state, Article 4, s. 1, all elections are directed to be by ballot; and "in such elections every white freeman of the age," etc., "shall enjoy the right of an elector." Thus the laws of Delaware appear to have drawn a visible dividing line between white persons and Negroes. Indeed the present situation of the community and the unalterable state of things require something of the kind. The present case seems to come within the intention and spirit of the Act of 1787, and therefore the witness must be rejected.

